UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DANNY DONOHUE, as President of the Civil
Service Employees Association, Inc., AFSCME,
AFL-CIO, JERRY LARICCHIUTA, as Local
President of CSEA Nassau County Local 830,
and the CIVIL SERVICE EMPLOYEES
ASSOCIATION, INC. Local 1000, AFSCME,
AFL-CIO,

                  Plaintiffs,

      -against-
                  '

EDWARD MANGANO, in his official capacity
as County Executive of Nassau County,
NASSAU COUNTY LEGISLATURE,
GEORGE MARAGOS, in his official capacity
as Nassau County Comptroller, and the
COUNTY OF NASSAU,

                 Defendants.
--------------------------------------------------------X
JOHN JARONCZYK, as President of the
Nassau County Sheriff's Correction Officers
Benevolent Association, Inc., and the NASSAU
COUNTY SHERIFF'S CORRECTION OFFICERS
BENEVOLENT ASSOCIATION, INC.

                  Plaintiffs,

      -against-

EDWARD MANGANO, in his official capacity
as County Executive of Nassau County,
COUNTY OF NASSAU,

                 Defendants.
--------------------------------------------------------X
JAMES CARVER, individually and as President
of the Police Benevolent Association of the Police
Department of the County of Nassau, Inc.,
POLICE BENEVOLENT ASSOCIATION OF
THE POLICE DEPARTMENT OF THE COUNTY
OF NASSAU, INC., GARY LEARNED, individually

**MEMORANDUM OF
DECISION AND ORDER
12-CV-2568 (ADS)(GRB)**

and as President of the Superior Officers Association,
Police Department, County of Nassau, Inc.,
SUPERIOR OFFICERS ASSOCIATION, POLICE
DEPARTMENT, COUNTY OF NASSAU, INC.,
GLENN CICCONE, individually and as President
of the Detectives' Association, Inc. of the Police
Department of the County of Nassau, and the
DETECTIVES' ASSOCIATION, INC. OF THE
POLICE DEPARTMENT OF THE COUNTY
OF NASSAU,

                Plaintiffs,

     -against-

COUNTY OF NASSAU, EDWARD MANGANO,
in his official capacity as County Executive of
Nassau County, the NASSAU COUNTY
LEGISLATURE, PETER SCHMITT in his
official capacity as Presiding Officer of the Nassau
County Legislature, and GEORGE MARAGOS,
in his official capacity as Nassau County
Comptroller,

                Defendants.
----------------------------------------------------------X

**APPEARANCES:**

**CIVIL SERVICE EMPLOYEES ASSOCIATION**
*Attorneys for the Plaintiffs Danny Donohue, as President of the Civil Service Employees
Association, Inc., AFSCME, AFL-CIO, Jerry Laricchiuta, as Local President of CSEA Nassau
County Local 830, Civil Service Employees Association, Inc. Local 1000, AFSCME, AFL-CIO*
143 Washington Avenue
Box 7125, Capitol Station
Albany, NY 12210
        By:    Daren J. Rylewicz, Esq.
                 Steven A. Crain, Esq.
                 Aaron Edward Kaplan
                 Miguel G. Ortiz, Esq., Of Counsel

2

**KOEHLER & ISAACS, LLP**
*Attorneys for the Plaintiffs John Jaronczyk*
*As President of the Nassau County Sheriff's Correction Officers Benevolent Association, Inc.,*
*and the Nassau County Sheriff's Correction Officers Benevolent Association, Inc.*
61 Broadway
25th Floor
New York, NY 10006
　　　　By:　　Howard Gary Wien, Esq., Of Counsel

**GREENBERG, BURZICHELLI & GREENBERG**
*Attorneys for the Plaintiffs James Carver, individually and as President of the Police Benevolent*
*Association of the Police Department of the County of Nassau, Inc., Police Benevolent*
*Association of the Police Department of the County of Nassau, Inc., Gary Learned, individually*
*and as President of the Superior Officers Association, Police Department, County of Nassau,*
*Inc., Superior Officers Association, Police Department, County of Nassau, Inc., Glenn Ciccone,*
*individually and as President of the Detectives' Association, Inc. of the Police Department of the*
*County of Nassau, and Detectives' Association, Inc. of the Police Department of the County of*
*Nassau*
3000 Marcus Avenue, Suite 17
Lake Success, NY 11042
　　　　By:　　Linda N. Keller, Esq..
　　　　　　　Seth H. Greenberg, Esq., Of Counsel

**OFFICE OF THE NASSAU COUNTY ATTORNEY**
**JOHN CIAMPOLI, COUNTY ATTORNEY**
*Attorney for the Defendants*
One West Street
Mineola, NY 11501
　　　　By:　　Barbara E. Van Riper, Assistant County Attorney

**MINORITY COUNSEL for the NASSAU COUNTY LEGISLATURE**
*Attorneys for the Amicus Minority Caucus, Nassau County Legislature*
1550 Franklin Avenue, Room 132
Mineola, NY 11501
　　　　By:　　Peter James Clines, Esq., Of Counsel

**SPATT, District Judge:**

　　　　Presently before the Court is a motion for a preliminary injunction filed by the Plaintiffs

to enjoin the implementation of Nassau County Local Law No. 8-2012, also known as Clerk

Item No. 315-2012, asserting that it violates the Plaintiffs' fundamental constitutional rights

secured by Article I, Section 10 of the United States Constitution (the "Contracts Clause"), as

well as other state statutory provisions.  For the reasons set forth below, the motion for a preliminary injunction is granted.

## I.  BACKGROUND

### A.  <u>Factual Background</u>

The Plaintiff Danny Donohue is the elected statewide president of the Civil Service Employees Association, Inc. (the "CSEA"), which represents approximately 295,000 employees and retirees throughout the State of New York.  The Plaintiff Jerry Laricchiuta is the elected President of the CSEA Nassau Local 830, a subdivision of the CSEA, which represents approximately 7,000 employees of Nassau County (the "County").

The Plaintiff John Jaronczyk is the elected president of the Nassau County Sheriff's Correction Officers Benevolent Association, Inc. ("COBA"), which represents County Sheriff's Department employees serving in the civil service titles of Correction Officer, Correction Corporal, Correction Sergeant, Correction Lieutenant, Correction Captain and employees serving in investigative ranks.

The Plaintiff James Carver is the president of the Police Benevolent Association of the Police Department of the County of Nassau, Inc. (the "PBA"), which is the exclusive collective bargaining representative of all uniformed police officers employed by the County.  The Plaintiff Gary Learned is the president of the Superior Officers Association Police Department, County of Nassau, Inc. (the "SOA"), which is the exclusive collective bargaining representative for the unit consisting of Superior Officers ranging from Sergeant through Assistant Chief of the County Police Department.  Finally, the Plaintiff Glenn Ciccone is the president of the Detectives' Association, Inc. of the Police Department of the County of Nassau (the "DAI"), which is the

exclusive collective bargaining representative for the unit consisting of Detectives employed by the County.

There are three sets of plaintiffs in this consolidated action—the Donohue Plaintiffs, the Jaroncyzk Plaintiffs, and the Carver Plaintiffs.  For purposes of this Order, the Court will refer to these three sets of plaintiffs collectively as the "Plaintiffs", "bargaining units", or "unions", unless otherwise specified.

The Defendants are the County of Nassau, the Nassau County Legislature (the "Legislature"), Edward Mangano, in his official capacity as County Executive of Nassau County, Peter Schmitt, in his official capacity as Presiding Officer of the Nassau County Legislature, and George Maragos, in his official capacity as Nassau County Comptroller.  "While the named Defendants differ in part as to each case due to the different groups of public employees represented as Plaintiffs in [each of the consolidated] matters, the object of the preliminary injunction motions and the arguments made in support of those motions are broadly the same." Donohue v. Paterson, 715 F. Supp. 2d 306, 312 (N.D.N.Y. 2010).  Thus for purposes of this Order, the Court will refer to the various defendants in all three consolidated actions collectively as the "Defendants".

In the three consolidated actions, the Plaintiffs are public employee organizations within the meaning of Section 201 of the Public Employees' Fair Employment Act, Civil Service Law §200 *et seq.* (the "Taylor Law"), as well as officers from these organizations.

> "[T]o promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government," Article 14 sets forth the rights of employee organizations, and the procedures governing their relations with the State as an employer.  See N.Y. Civ. Ser. Law § 200.

Donohue, 715 F. Supp. 2d at 313.

The manifestation of this working relationship between the County government and its employees is their negotiated contractual agreements.  The Plaintiffs are parties to a number of various collective bargaining agreements ("CBAs") with the County, which set forth the terms and conditions of their employment.  In particular, the terms of the CBAs generally include salaries, wages, employee benefits such as medical insurance, and hours of work.  In each of the three Complaints in the present case, the Plaintiffs take care to describe the relevant background information that is specific to their bargaining unit's negotiation history.  Several of the unions describe the concessions that they have made throughout the past few years, in order to meet the demands of the previous County Executive.

On April 30, 2012, the County Executive Edward Mangano ("Mangano" or the "County Executive") proposed Local Law No. 8-2012—also known as Clerk Item No. 315-2012 ("LL 315-12")—which was submitted to the County Legislature for approval.  LL 315-12 explains the background of the law, in a section entitled "Legislative Intent", as follows:

> Nassau County is currently embroiled in a fiscal crisis which has seriously jeopardized its ability to finance the payment of tax certiorari settlements and judgments.  This crisis is particularly acute because the inability of the County to finance the payment of those settlements and judgments has resulted in economic hardship for many of the County residents and businesses who are owed refunds pursuant to those settlements and judgments.

(LL 315-12 § 1.)  The legislation goes on to refer to the historical background of the law.  In particular, it states that the County Executive had submitted a multi-year financial plan, approved by the Nassau County Interim Finance Authority ("NIFA"), which included provisions for transitional financing of tax refunds.  However, in order to secure bonding to finance the payments under this plan, a bipartisan super-majority vote of the County Legislature was

6

required pursuant to the New York Local Finance Law.  Thus, despite the "clear need to raise funds to finance the payment of these refunds," the law states that "certain Legislators have steadfastly refused to approve any bonding absent a *quid pro quo*".  (LL 315-12 § 1.)

This set of circumstances has supposedly led to a conundrum for Mangano and the County.  Because the Legislature failed to approve the bonding to cover the payment of these settlements and judgments, "the individuals and businesses who are owed refunds are entitled to ask a court to order the execution of those judgments and settlements by levying against the County's bank accounts . . . [which] would result in widespread chaos throughout the County." (LL 315-12 § 1.)  Thus, in light of this economic problem, the County Executive took action to provide for the financing necessary for the payment of the tax certiorari refunds owed by the County.  The action he took was the creation and proposal of LL 315-12.

The provision currently at issue in this suit is Section 2, entitled "Action by the County Executive".  It states, in pertinent part, that:

> (A) Notwithstanding any inconsistent provision of law, the County Executive, upon the issuance of an Executive Order invoking this Local Law, shall be authorized to take any action he deems necessary, including but not limited to, the following actions in order to create forty-million-dollars in savings for the County.
> 1. relieve from duty any duty [*sic*] employees represented by a collective bargaining unit for one day per week [("furloughing")]
> 2. embargo County funds
> 3. modify any County contracts
> 4. freeze base and supplemental wages for County employees
> 5. reduce or eliminate employer contribution to employee benefits
> 6. sell, lease, or otherwise dispose of any and all real and personal property owned by the County including, but not limited to, vehicles, buildings, land, computers, and heavy machinery
> 7. close or restrict hours of operation of any County facility

8. reduce or eliminate any County operated program or service whose continuing existence is not mandated by State or Federal law
9. shutter, reduce, or eliminate any County agency or department whose continuing existence is not mandated by State or Federal law
10. reduce or eliminate assistance to Towns, Cities and Villages within the County
11. any action not enumerated in this list but otherwise authorized pursuant to State, Federal or County law

(LL 315-12 § 2.)  Any savings realized from these actions would be utilized solely for the purpose of financing tax certiorari judgments and settlements.

On May 21, 2012, LL 315-12 was scheduled for a vote of the full legislature.  However, the Plaintiffs claim that only 18 of the 19 County Legislators were present in the Legislative Chamber for the day's proceedings.  According to the Plaintiffs, it was announced that Legislator Dennis Dunne was in another room in the building and would be participating from that location.  The Plaintiffs allege that throughout the day's proceedings, Presiding Officer Peter Schmitt began discussions with regard to LL 315-12 and County Attorney John Ciampoli spoke on the subject.  Presiding Office Schmitt then supposedly announced "We're going to conclude this hearing and I'm not calling a vote today", and that the Legislature would vote on this law at another time.

However, according to the allegations in the Complaint, at the conclusion of all other business, on May 21, 2012, Presiding Officer Schmitt called for a vote on LL 315-12 without permitting public comment.  At that time, all nine Democratic members of the County's legislature, constituting the Legislative Minority, allegedly refused to participate in the vote and then exited the Legislative chambers in protest.  The nine remaining members of the Legislature—the Republicans and part of the Legislative Majority—voted in favor of passing LL

8

315-12.  In addition, Presiding Office Schmitt counted Legislator Dunne as the tenth affirmative

vote in favor of LL 315-12.

**B.  Procedural History**

On May 22, 2012, the day following the legislative vote, three separate actions were filed

in this Court— 12–CV–2568 (the Donohue Plaintiffs); 12–CV–2569 (the Jaroncyzk Plaintiffs);

and 12–CV–3066 (the Carver Plaintiffs)—all stemming from the above described "passage" of

LL 315-12.  The Plaintiffs asserted multiple causes of action for violations of (1) the Contract

Clause, pursuant to 42 U.S.C. § 1983; (2) the New York State Constitution, Article I, § 17 and

Article 14, § 2(c); (3) the New York State Municipal Home Rule Law, § 10; (4) Article 7 of the

Public Officers Law, entitled the Open Meetings Law, §§ 103–04; (5) General Construction

Law, § 41; and (6) Nassau County Charter, § 152.  With regard to the relief sought, the Plaintiffs

sought a declaratory judgment that certain portions of LL 315-12 violate the above mentioned

constitutional and statutory provisions, and the entry of a permanent injunction to enjoin the

County Executive from taking any further action to implement or enforce the unconstitutional

portions of LL 315-12.  In addition, they sought a temporary restraining order and a preliminary

injunction.

The Court held a hearing on that day, May 22, 2012, and learned that LL 315-12 had not

yet been signed into law by the County Executive.  Thus, because of concerns about ripeness,

this Court denied the request for a temporary restraining order and a preliminary injunction

without prejudice, with leave to renew if, and when, the County Executive either signed LL 315-

12 into law or took no action with regard to bill for a specified period of time, either of which

event would render the law effective.

On or about June 18, 2012, County Executive Mangano officially signed LL 315-12 into law.  On June 19, 2012, the Plaintiffs filed a second motion for a temporary restraining order and a preliminary injunction.  On June 20, 2012, the Court held a second hearing.  At this time, the Court consolidated the three cases on the record, bearing case number 12-CV-2568.  In addition, the Court set a briefing schedule, based upon a representation by the Defendants that no executive orders would be issued pursuant to LL 315-12 until the Court issued a decision on the motion for preliminary injunctive relief.  Thus, the motion for a temporary restraining order has been essentially converted into a motion for a preliminary injunction.  See Hedges v. Obama, No. 06 Civ. 0589, 2012 WL 1721124, at *1 (S.D.N.Y. May 16, 2012) (converting a motion for a temporary restraining order into a motion for a preliminary injunction during a conference with the court).

Finally, the Court granted permission for the Minority Caucus of the Legislature to file an amicus curiae brief, which it did on July 19, 2012.  The Minority Caucus consists of Minority Leader Kevan Abrahams and Legislators Wayne H. Wink, Jr., Robert Troiano, Carrié Solages, Joseph Scannell, Judi Bosworth, Judy Jacobs, Delia Deirggi-Whitton, and David Denenberg (collectively the "Minority Caucus" or "amicus").  The Defendants urge the Court to strike the amicus brief because it is twenty-five pages in length, despite being a "reply" brief in connection with the Plaintiffs' motion for a preliminary injunction.  However, the Court rejects this argument and will consider the entirety of the amicus brief.

## II. DISCUSSION

Broadly, the Plaintiffs claim that LL 315-12 authorizes the County Executive to take actions that will diminish the actual and negotiated salaries and benefits received by the thousands of employees covered under the relevant CBAs, and that the impact of these

10

impairments will be widespread and irreparable.  The Plaintiffs argue in support of their motion

for a preliminary injunction that this law renders the agreements between the unions and the

County unenforceable, and thus virtually obliterates the authority and position of the unions as

bargaining representatives.

There are specific portions of LL 315-12 that undoubtedly apply to the Plaintiff unions

and thus are at issue in the present case, such as the County Executive's power to (1) "relieve

from duty any duty employees represented by a collective bargaining unit for one day per week";

(2) "modify any County contracts"; (3) "freeze base and supplemental wages for County

employees"; and (4) reduce or eliminate employer contribution to employee benefits".  (LL 315-

12, §2(A)(1), (3)–(5).)  However, there are other portions of the law that the Plaintiffs do not

challenge and do not appear to be in contention, such as the County Executive's power to "sell

lease, or otherwise dispose of any and all real and personal property owned by the County

including, but not limited to, vehicles, buildings, land, computers, and heavy machinery".  (LL

315-12, §2(A)(6).)  This Decision will only address the provisions of LL 315-12 to the extent

that they modify the CBAs and other contractual employment agreements between the Plaintiffs

and the Defendants.  Therefore, the Court will take no position on any provisions in LL 315-12

to the extent that they do not affect the Plaintiffs' contractual rights.

The issues presented by the present motion are myriad and complex.  The Court will first

address any questions as to jurisdiction, and will then proceed to assess the substantive merits of

the motion for a preliminary injunction.

## A.  <u>Stay Requested by the Defendants</u>

As an initial matter, on August 10, 2012, the Defendants wrote a letter to the Court

requesting a stay of the case while they pursue a course of action, which, if successful, would

render moot the issues before the Court.  "Specifically, Defendants are examining a method to address and resolve the County's liability for over $40 million in tax certiorari judgments that would have no contractual impairment on Plaintiffs."  (Docket Entry No. 39.)  Each set of Plaintiffs subsequently wrote a response to the Court, vehemently opposing any such request.

In their August 10, 2012 communication to the Court, the Defendants do not provide any specificity as to the "method" they are investigating to obtain the necessary funding, nor do they state any sort of time period in which they can accomplish such a task.  In light of the finding of irreparable harm explored below, the Court is not satisfied that an indefinite stay of the case based solely on the County's vague search for other options is the appropriate course of action.  Even if the County refrains from taking any action pursuant to LL 315-12, the existence of the law instigates an irreparable harm by itself.  The entire premise underlying the preliminary injunctive relief requested here is to avoid the furtherance of this harm.  To grant a stay and defer enforcement of the law would be plainly contradictory to that goal and thus may pose further injury to the Plaintiffs.

Moreover, to deny the stay would likely not injure the Defendants in any way.  If, as the Defendants state, they are acting in furtherance of resolving the County's liability for more than $40 million in tax certiorari judgments in a way that would have no contractual impairment on the Plaintiffs, then there is one simple solution—they can repeal LL 315-12.  Alternatively, as explained below, if the County obtains a certification issued by the Office of Legislative Budget Review that the $40 million in savings have been achieved, the law will automatically expire, thus rendering the present case moot.  (LL 315-12, § 2(B).)  The Defendants have had ample time to pursue either of these options, and will continue to have the time to do so even after the issuance of this Decision and Order.

Therefore, the Court declines the Defendants' request to stay the present case and will proceed to rule on the Plaintiffs' motion.

## B.  Mootness

The next threshold issue that the Court must address prior to reviewing the substantive merits of the case is mootness.  See Aladdin Capital Holdings, LLC v. Donovan, 438 Fed. App'x. 14, 15 (2d Cir. 2011) ("We must first address whether we have Article III jurisdiction and resolve an issue of mootness."); see also United States v. Miller, 263 F.3d 1, 4 n.2 (2d Cir. 2001) ("[A] federal court may not . . . decide a case on the merits before resolving whether the court has Article III jurisdiction.").  In short, the amicus asserts that the County has decided to use existing cash reserves to pay the outstanding tax certiorari judgments at issue.  Accordingly, because the sole purpose of the law has already been fulfilled, the amicus contends that the Court need not address the constitutionality of LL 315-12's provisions.

"Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies."  In re Zarnel, 619 F.3d 156, 162 (2d Cir. 2010).  Under the doctrine of mootness, a court no longer has subject matter jurisdiction when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969) (internal quotation marks omitted)).

Thus, for a federal court to have subject matter jurisdiction over a case, "it is not enough that a dispute was very much alive when suit was filed . . . . The parties must continue to have a personal stake in the outcome of the lawsuit."  Knaust v. City of Kingston, 157 F.3d 86, 88 (2d Cir. 1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477–78, 110 S. Ct. 1249,

108 L. Ed. 2d 400 (1990)) (internal citation and quotations omitted), cert. denied, 526 U.S. 1131,

119 S. Ct. 1805, 143 L. Ed. 2d 1009 (1999); see Church of Scientology of Cal. v. United States,

506 U.S. 9, 12, 113 S. Ct. 447, 121 L. Ed. 2d 313 (1992) ("It has long been settled that a federal

court has no authority to give opinions upon moot questions or abstract propositions, or to

declare principles or rules of law which cannot affect the matter in issue in the case before it."

(internal quotation marks omitted)).

Thus, the preliminary and essential inquiry is whether the relief sought by the Plaintiffs is

no longer needed, so as to make the present case moot.  See Martin–Trigona v. Shiff, 702 F.2d

380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can

no longer be given or is no longer needed."); Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir.

1993) ("Accordingly, a case that is 'live' at the outset may become moot 'when it becomes

impossible for the courts, through the exercise of their remedial powers, to do anything to redress

the injury.'") (quoting Alexander v. Yale, 631 F.2d 178, 183 (2d Cir. 1980)).

LL 315-12 is undoubtedly clear in that the County Executive may take any action he

deems necessary, but only for the express purpose of achieving $40 million in savings in order to

pay outstanding judgments for real property tax refunds, commonly known as "tax certiorari

judgments".  LL 315-12 provides that "[a]ny savings realized pursuant to the authorities granted

by this Local Law shall be used solely to finance tax certiorari judgments and settlements."

Moreover, the law explicitly states that the "authorities granted" under the law "shall expire upon

a certification issued by the Office of Legislative Budget Review that forty-million dollars in

savings have been achieved."  (LL 315-12, § 2(B).)

The mootness issue was not raised by any of the parties, but rather by the amicus

Minority Counsel.  In the amicus papers, the Minority Counsel asserts that this entire dispute is

14

moot because the purpose of LL 315-12—saving $40 million to satisfy outstanding tax certiorari judgments—has been fulfilled.  The Minority Counsel bases this factual assertion on a transcript from the June 18, 2012 legislative session.  From this, it concludes that the County Executive has decided to pay the outstanding tax judgments using a pool of money referred to as "the unallocated and undesignated fund balance."

In response, the Defendants first argue that this is an issue that cannot be properly raised by the amicus curiae.  However, the Court need not reach the legal question of whether this mootness argument raised through the vehicle of an amicus brief is proper, because there is sufficient evidence before the Court to find that its factual premise is fatally flawed and thus, mootness does not yet taint the instant case.

Although the amicus has been unable to produce a certification issued by the Office of Legislative Budget Review stating that the savings have been achieved—nor does it claim one exists—it maintains that this requirement has been fulfilled for all intents and purposes.  As mentioned above, this assertion is based upon a legislative session that took place on June 18, 2012, the same day that LL 315-12 went into effect.  At that time, County Budget Director Eric Naughton stated on the record that "the County has roughly 92 million in undesignated fund balance" at its disposal.  (See Clines Decl., Ex. B, at 82–83.)  Thus, at this session, it was determined that a $43 million entry would be made in the County's books.  Maurice Chambers, the Director of the Legislative Budget review, stated that: "The 92 million is what we have in reserves; that's real money.  The 43 million is just an entry to recognize the 43 million liability for tax certs, which ultimately will be taken out of the fund balance."  (Id., at 110.)

However, the Court agrees with the Defendants that the transcript of the June 18, 2012 legislative session makes clear that there has been no actual transfer of money to pay for the

outstanding judgments.  This dialogue does not indicate that the County planned to actually use the reserves to pay the tax certiorari judgments.  Rather, it appears to the Court that the discussion was merely about how to properly account for these judgments on the County's books.  In fact, Budget Director Naughton stated that "[w]e are transferring the money to the treasurer's office so the comptroller's office can book and accrual for tax certs."  (Id. at 67.) Frank Moroney, the Deputy Comptroller, also stated at the session that "[w]e're transferring this because it appears as though there is going to be a deficit, and it has to be assigned to the proper place, and that would be to tax certioraris."  (Id. at 70.)  According to the Defendants, the only thing they determined was that for accounting purposes for the 2011 budget, the Office of Legislative Budget Review set up an appropriation line in the 2011 budget, which did not previously contain any budgeted line for the payment of certioraris, to allow a deficit for the 2011 budget to be recognized as a deficit due to the tax certiorari liabilities.  (Ciampoli Reply Aff. at ¶¶ 10-14 & Ex. A. at 60–65, 85.)

Furthermore, even if this somewhat unclear language were to indicate an intention to use the undesignated fund balance to pay the real property tax refunds, this expressed desire alone would be insufficient for the Court to find either that the purpose of the law has been met or that the certification has, for all intents and purposes, been satisfied.

The County Legislature did eventually pass Resolution No. 103-2012, filed as Clerk Item No. 350-12.  (See Clines Decl., Ex. C.)  According to the amicus, this documentation authorizes a board transfer to the general fund in the amount of $43,092,437.  Also, the amicus has presented evidence that shows that the transfer is reflected in the County's "NIFS" financial system, as it contains an entry for the $43,092,437 for "year end tax accrual".  (See Clines Decl., Ex. D.)  However, with reasonable certainty, these documents may not actually evidence

anything more than an accounting maneuver by the County for budgetary concerns.  At this juncture, it does not suffice for the Court to find that the $43 million "debt" of the County has been satisfied, so that any determination as to LL 315-12 is moot.

Therefore, at this time, the Court finds that there are no concerns of mootness to preclude a determination of the instant motion for a preliminary injunction.  Of course, mootness is an argument that can be raised throughout the litigation.  <u>Irish Lesbian and Gay Org. v. Giuliani</u>, 143 F.3d 638, 648 (2d Cir. 1998) ("Federal Rule of Civil Procedure 12(h)(3) requires a court to consider impediments to subject matter jurisdiction at any time during the course of a litigation. . . . The Federal Rules place the duty to enforce barriers such as mootness on the courts, and our rule is that courts may *sua sponte* ask the parties to address any exception to mootness that may apply."); <u>see Fox v. Board of Trustees</u>, 42 F.3d 135, 140 (2d Cir. 1994) (explaining that the issue of mootness is one of subject matter jurisdiction that may be raised at any time).  Thus, if the approximate $40 million is secured through another avenue and if a certification is received so that LL 315-12 expires, the case would most certainly qualify as moot.  However, that is not the situation presently before the Court.

## C.  <u>As to Abstention</u>

The next relevant inquiry is whether the abstention doctrine precludes the Court from granting the Plaintiffs the preliminary injunctive relief they seek.  On or about June 8, 2012, the Jaronczyk set of Plaintiffs—specifically SOBA and Jaronczyk—filed an action in the Supreme Court of the State of New York, Nassau County, seeking injunctive and declaratory relief on the claim that LL 315-12 is void pursuant to state and local laws.  This case, as well as the motion for injunctive relief, is still pending.  (<u>See</u> Docket Entry No. 37).  Thus, the Defendants argue

17

that this Court should abstain from the entire action, because the Plaintiffs can plausibly raise both their federal and state law claims in the state court venue.

"The Court has described three considerations that prompt abstention in the face of broad-based challenges to state statutes: (1) that a federal court will interpret state law without having the benefit of a state court interpretation which may come at a later time and be at odds with the federal court interpretation; (2) that the federal court decision may encompass matters as to which there is no real case or controversy; and (3) that the domestic policies of a state may be unnecessarily obstructed when a state court is impeded from interpreting and applying the state's statutes." Liberty Mutual Insurance Co. v. Hurlbut, 585 F.3d 639, 646–67 (2d Cir. 2009).

Underneath the umbrella of the broad theory of abstention are several doctrinal strands. There is one particular abstention doctrine that is relevant in the instant case— the Younger abstention doctrine, which prohibits federal courts from interfering with ongoing state proceedings. See Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). The Jaronczyk Plaintiffs incorrectly focus on Pullman abstention, which prohibits federal courts from resolving a federal constitutional issue when a state court's clarification of ambiguous state law might make the federal court's constitutional ruling unnecessary. See R.R. Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643, 85 L. Ed. 971 (1941). However, Pullman is not applicable in the instant case because resolution of the federal issue—namely, the Contracts Clause in the United State Constitution—does not depend on any construction of the state laws at issue. See, e.g., United Fence & Guard Rail Corp. v. Cuomo, 878 F.2d 588, 596 (2d Cir. 1989) (finding Pullman inapplicable, in part because there was no state law issue raised in the state case the disposition of which would alter, modify, or moot the federal constitutional issue raised in the instant matter); Sherman v. Town of Chester, No. 01 Civ. 8884, 2001 WL 1448613, at *3

18

(S.D.N.Y. Nov. 15, 2001) (holding that Pullman abstention was inapplicable to substantive due process claim challenging town's moratorium on development, noting that "[t]he resolution of the federal question does not 'depend' on the resolution of . . . whether the Town acted ultra vires under [the New York Home Rule Law] in enacting the [challenged restriction]").

Different from Pullman, "[t]he Younger abstention rule refers to the principle of federalism that 'a federal court may not enjoin a pending state criminal proceeding in the absence of special circumstances suggesting bad faith, harassment or irreparable injury that is both serious and immediate.'" Pathways, Inc. v. Dunne, 329 F.3d 108, 113–14 (2d Cir. 2003) (quoting Kirschner v. Klemons, 225 F.3d 227, 233 (2d Cir. 2000)). The principles enunciated in Younger have been expanded to civil proceedings. See Huffman v. Pursue, Ltd., 420 U.S. 592, 594, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (1975); see also Moore v. Sims, 442 U.S. 415, 423, 99 S. Ct. 2371, 2377, 60 L. Ed. 2d. 994 (1979) ("the basic concern—that threat to our federal system posed by displacement of state courts by those of the National Government—is also fully applicable to civil proceedings in which important state interests are involved."). In Middlesex County Ethics Committee v. Garden State Bar Association, the Supreme Court stated that "[t]he policies underlying Younger are fully applicable to noncriminal judicial proceedings when important state interests are involved." 457 U.S. 423, 432, 102 S. Ct. 2515, 2521, 73 L. Ed. 2d 116 (1982) (citing Moore, 442 U.S. at 423, 99 S. Ct. at 2377).

Notably, in the "interests of comity and federalism," the Younger abstention doctrine requires federal courts to abstain from jurisdiction "whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 237–38, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984) (emphasis added). Accordingly, Younger abstention "does not apply when a plaintiff's federal

claims cannot be presented in pending state proceedings."  Tellock v. Davis, No. 02 Civ. 4311, 2002 WL 31433589, at *4 (E.D.N.Y. Oct. 31, 2002) (citing Kirschner, 225 F.3d at 233).

Younger is not based upon an Article III requirement, but instead is a "prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." Spargo v. New York State Com'n on Judicial Conduct, 351 F.3d 65, 74 (2d Cir. 2003); see Benavidez v. Eu, 34 F.3d 825, 829 (9th Cir. 1994) ("Younger abstention is *not* jurisdictional, but reflects a court's prudential decision not to exercise jurisdiction which it in fact possesses.") (emphasis in original); Schachter v. Whalen, 581 F.2d 35, 36 n. 1 (2d Cir. 1978) (per curiam) ("Younger abstention goes to the exercise of equity jurisdiction, not to the jurisdiction of the federal district court as such to hear the case.").  The rationale behind Younger was set forth by the Second Circuit in Spargo v. New York State Com'n on Judicial Conduct:

> "Our Federalism" in its ideal form, as the Supreme Court explained in Younger, strives towards a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.  In recognition of this balance of interests, Younger generally prohibits courts from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings so as to avoid unnecessary friction.  Giving states the first opportunity . . . to correct their own mistakes when there is an ongoing state proceeding serves the vital purpose of reaffirm[ing] the competence of the state courts" and acknowledging the dignity of states as co-equal sovereigns in our federal system.

351 F.3d at 75 (internal quotations and citations omitted).

With this doctrinal framework in mind, the Second Circuit has instructed that "Younger abstention is mandatory when: (1) there is a pending state proceeding, (2) that implicates an

important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims". Id.

Unfortunately, the Jaronczyk Plaintiffs' treatment of this issue—the only set of Plaintiffs that initiated a parallel state court action against these Defendants concerning LL 315-12—is quite terse.  Initially  it appears that every requirement under Younger is met in the instant case. First, there is no question that there is an ongoing state court proceeding pending in Nassau Supreme Court by this particular set of plaintiffs.  Although technically the federal case was initiated prior to the state court action, the present motion for injunctive relief was brought simultaneously with a motion for injunctive relief in the state court action.  The principles of Younger apply in full force so long as the state proceedings are begun "before any proceedings of substance on the merits have taken place in the federal court."  Hawaii Housing Auth., 467 U.S. at 238, 104 S. Ct. at 2328 (quoting Hicks v. Miranda, 422 U.S. 332, 349, 95 S. Ct. 2281, 2291–2292, 45 L. Ed. 2d 223 (1975)); see also Greening v. Moran, 953 F.2d 301, 304–05 (7th Cir. 1992) ("That the putative state defendant managed to get the federal suit under way first is inconsequential.").  No proceedings of substance on the merits have taken place if the case has not progressed beyond the "embryonic stage", and thus Younger may be applicable here. Midkiff, 467 U.S. at 238, 104 S. Ct. at 2328 (quoting Doran v. Salem Inn, Inc., 422 U.S. 922, 929, 95 S. Ct. 2561, 2566–67, 45 L. Ed. 2d 648 (1975)).

Second, there are important state interests implicated by the present case; namely, the process by which the County Legislature passes legislation and specifically whether LL 315-12 passes state constitutional muster.  New York has established a comprehensive statutory scheme to govern the legislative process and it has a strong interest in promoting the fairness and legality of this system.  See, e.g., State of Nev. v. Skinner, 884 F.2d 445, 453 (9th Cir. 1989) ("Nevada's

complaints regarding cooption of state resources must be resolved in the legislative process; it is that process which protects the fundamental interests of the states.").

As to the third factor, there is no doubt that the federal constitutional claims can be raised in the state court proceeding.  The New York State supreme courts afford the Plaintiffs an opportunity to raise their constitutional Contracts Clause claims.  See Juidice v. Vail, 430 U.S. 327, 337, 97 S. Ct. 1211, 51 L. Ed. 2d 376 (1977) (reasoning that where it is "abundantly clear that appellees had an opportunity to present their federal claims in the state proceedings . . . [n]o more is required to invoke Younger abstention"); Spargo, 351 F.3d at 81 ("In sum, while Spargo may prefer a federal forum, he may pursue his constitutional claims in state proceedings, and therefore, the District Court should have abstained."); see also 31 Foster Children v. Bush, 329 F.3d 1255, 1279 (11th Cir. 2003) (concluding that "[i]n determining whether the state remedies are adequate . . . the relevant question is not whether the state courts can do all that Plaintiffs wish" but rather whether plaintiffs may pursue their federal claims in state proceedings) (internal quotation marks omitted), cert. denied sub nom. Reggie B. v. Bush, 540 U.S. 984, 124 S. Ct. 483, 157 L. Ed. 2d 376 (2003).

Nevertheless, while it appears that Younger should apply in the instant case so that this Court should abstain from exercising jurisdiction, there are two major wrinkles that the Court must necessarily address.

The first issue is that only the Jaroncyzk set of Plaintiffs are currently pursuing an action in state court with regard to LL 315-12.  The Plaintiffs not involved in the pending state court proceeding—the Donohue and Carver Plaintiffs—essentially argue that they should not have to face the consequences of the third set of plaintiffs filing a state court action.  In other words, they argue that Younger does not permissibly extend to their claims because they are not a party to

the ongoing state court proceeding.  These other Plaintiffs cry out that they should not be penalized as to their choice of forum because of a questionable strategic decision made by a similar yet separate party.  The fact that the Donohue and Carver Plaintiffs are not a party to the state court action is relevant, but not dispositive.  Kunz v. N.Y. State Com'n on Judicial Conduct, 356 F. Supp. 2d 188, 193 (N.D.N.Y. 2005); see Doran v. Salem Inn, Inc., 422 U.S. 922, 928, 95 S. Ct. 2561, 45 L. Ed. 2d 648 (1975) (warning that while plaintiffs should not "automatically be thrown into the same hopper for Younger purposes," there may plainly "be some circumstances in which legally distinct parties are so closely related that they should all be subject to the Younger considerations which govern any one of them").

Generally, "where the plaintiff in a federal action is not a party to the state proceeding, Younger concerns about federal adjudication do not arise."  Sullivan v. City of Pittsburgh, 811 F.2d 171, 177 (3d Cir. 1987) (citing Doran, 422 U.S. 922); see Blackwelder v. Safnauer, 689 F. Supp. 106, 119 (N.D.N.Y. 1988), aff'd on other grounds, 866 F.2d 548 (2d Cir. 1989) ("As a general proposition, abstention is mandated under Younger only when the federal plaintiff is actually a party to the state proceeding; the doctrine does not bar non-parties from raising constitutional claims in federal court, even if the same claims are being addressed in a concurrent state proceeding involving similarly situated parties.") (citation omitted).

However, "in certain circumstances, Younger may apply to the claims of third-parties who are not directly involved in any pending state proceeding."  Spargo, 351 F.3d at 82; see also Cedar Rapids Cellular Tel., L.P. v. Miller, 280 F.3d 874, 881–82 (8th Cir. 2002) ("It is not a prerequisite to Younger abstention that the federal plaintiffs also be defendants in the action pending in state court.").  Parties that are "too closely related should be treated as one party for Younger purposes."  Sullivan v. City of Pittsburgh, P.A., 811 F.2d 171,  177 (3d Cir. 1987); see

23

Blackwelder, 689 F. Supp. at 119 ("An exception to this rule comes into play when 'legally distinct parties are so closely related that they should all be subject to the Younger considerations which govern any one of them.'" (quoting Doran, 422 U.S. at 928, 95 S. Ct. at 2566).

Whether parties should be treated the same for purposes of the Younger analysis is not a straightforward inquiry.  The Court must assess whether "the plaintiffs' interests are so inextricably intertwined that direct interference with the state court proceeding is inevitable, [such that] Younger may extend to bar the claims of plaintiffs who are not party to the pending state court proceeding."  Spargo v. N.Y. State Comm'n on Judicial Conduct, 351 F.3d 65, 82 (2d Cir. 2003) (holding that the plaintiffs' federal claims are essentially derivative so that the court should abstain from exercising jurisdiction over the plaintiffs' claims, even though not all plaintiffs are involved in the state court action);

Parties have been found to be closely related in two different contexts: "(1) an employer's federal suit when its employees assert identical interests in state court; and (2) cases in which federal plaintiffs are closely related to state defendants in terms of ownership, control and management." Id. at 178.  See, e.g., Hicks v. Miranda, 422 U.S. 332, 348–49, 95 S. Ct. 2281, 45 L. Ed. 2d 223 (1975) (finding the interests of two employees of a movie theater to be intertwined with that of the owners in connection with a state obscenity statute).  Cf. Doran, 422 U.S. at 928, 95 S. Ct. at 2566 (finding that three separate bar owners had similar business interests but were otherwise "unrelated in terms of ownership, control, and management," so that Younger did not apply).

Although it is unlikely that the three sets of Plaintiffs here are so inextricably intertwined that they would be treated as the same party for purposes of Younger abstention, the second wrinkle in this case allows the Court to avoid even addressing the issue.  This is because

regardless of which set of Plaintiffs initiated the state court action, if the Court finds that the parallel state court proceeding is remedial, not coercive, it is possible that Younger abstention would simply not apply.

"In the paradigm situation calling for Younger restraint, the state defendant brings a federal action challenging the statute [which is simultaneously being applied against him]." Fernández v. Trías Monge, 586 F.2d 848, 851 (1st Cir. 1978); see, e.g., Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S. Ct. 1519, 95 L. Ed. 2d 1 (1987) (federal plaintiff seeking to enjoin state plaintiff from enforcing judgment against him); Moore v. Sims, 442 U.S. 415, 99 S. Ct. 2371, 60 L. Ed. 2d 994 (1979) (federal plaintiffs seeking to enjoin state proceedings against them for child abuse).  As noted by the Sixth Circuit, "Younger cases generally have a common procedural posture".  Devlin v. Kalm, 594 F.3d 893 (6th Cir. 2010).

> In the typical Younger case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings.  Moreover, the basis for the federal relief claimed is generally available to the would-be federal plaintiff as a defense in the state proceedings.

Crawley v. Hamilton County Comm'rs, 744 F.2d 28, 30 (6th Cir. 1984).

This is not the situation presented by the case at bar.  Rather, putting aside the issue of the other two sets of plaintiffs not seeking state court relief, the parallel state and federal civil actions were initiated by the same private party.  Consequently, the Court faces the thorny issue of whether this is the type of case that warrants abstention under Younger.  In particular, the Court must determine whether the state proceeding is "the type of proceeding to which Younger applies," New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 367, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989), which normally means "state criminal prosecutions" or "civil enforcement proceedings," id. at 368, 109 S. Ct. 2506.

In the Younger context, a number of federal courts, as well as legal commentators, have

focused on the distinction between state remedial actions and coercive actions.  The dichotomy

largely stems from a footnote found in the Supreme Court case of Ohio Civil Rights Commission

v. Dayton Christian Schools, 477 U.S. 619, 106 S. Ct. 2718, 91 L. Ed. 2d 512 (1986), which

stated that:

> The lower courts have been virtually uniform in holding that the
> Younger principle applies to pending state administrative
> proceedings in which an important state interest is involved. . . .
>
> The application of the Younger principle to pending state
> administrative proceedings is fully consistent with Patsy [v. Board
> of Regents of the State of Florida, 457 U.S. 496 (1982)], which
> holds that litigants need not exhaust their administrative remedies
> prior to bringing a § 1983 suit in federal court.  Unlike Patsy, the
> administrative proceedings here are coercive rather than remedial,
> began before any substantial advancement in the federal action
> took place, and involve an important state interest.

Id., 477 U.S. at 627 n.2, 106 S. Ct. at 2723.  Thus, based upon this language, "some courts [in

determining whether to abstain,] evaluate whether the federal plaintiff is involved in a 'coercive'

state proceeding, in other words a state-initiated enforcement action in which the plaintiff does

not have a choice to participate, or a 'remedial' proceeding in which the plaintiff initiated an

option to seek a remedy for the state's wrongful action."  Eric Turner, Comment, You Say

Remedial, I Say Coercive, Let's Call the Whole Thing Off: Why the Remedial/Coercive

Distinction Is Not Critical in Younger Abstention, 49 Washburn L.J. 629, 641 (2010).  One

district court case from the Third Circuit has defined the dichotomy between remedial and

coercive proceedings as follows: "In remedial state proceedings, the plaintiff is attempting in

both state and federal courts to vindicate a wrong inflicted by the state; in coercive state

proceedings, the federal plaintiff is the state court defendant, and the state proceedings were

initiated to enforce a state law." Remed Recovery Care Ctrs. v. Twp. of Worcester, No. 98 Civ. 1799, 1998 WL 437272, at *3 (E.D. Pa. July 30, 1998) (citations omitted).

The circuits are not uniform in their application of the remedial/coercive distinction in the abstention context. As one commentator has noted, circuits disagree not only about whether the coercive-remedial distinction matters, but also how to tell the difference. Turner, supra, at 641. Nevertheless, many circuits that have addressed the issue have found the distinction to be a crucial one, especially when the remedial nature of the state court proceeding is apparent. For instance, the Third Circuit and its district courts have consistently held that federal courts should abstain under Younger only when the state proceedings are "coercive", rather than "remedial". See O'Neill v. City of Philadelphia, 32 F.3d 785, 791 n.13 (3d Cir. 1994) (citing Dayton, 477 U.S. at 627 n.2, 106 S. Ct. 2718, 91 L. Ed. 2d 512); see also Wyatt v. Keating, 130 Fed. App'x. 511, 514 (3d Cir. 2005); Smolow v. Hafer, 353 F. Supp. 2d 561, 572 (E.D. Pa. 2005); Antonelli v. New Jersey, 310 F. Supp. 2d 700, 711–12 (D.N.J. 2004) ("Abstention is only proper when the state court proceeding is a coercive action instituted by the state").

Precedent from the Seventh Circuit also appears to advise against application of Younger in the circumstances the Court currently faces. See Beary Landscaping, Inc. v. Ludwig, 479 F. Supp. 2d 857, 867 (N.D. Ill. 2007) ("Because the State has not initiated any proceeding against the plaintiffs in the instant suit, that factor cuts in favor of proceeding, as opposed to abstaining, here."). In Nader v. Keith, 385 F.3d 729 (7th Cir. 2004), the Seventh Circuit emphasized that an important consideration concerning the applicability of Younger abstention is whether the State has initiated prior enforcement proceedings against the plaintiffs, or whether, as is the situation in the instant case, the plaintiffs are simply pursuing parallel relief in both state and federal fora. Id. at 732 (collecting cases); accord, e.g., SSDD Enterprises, Inc. v. Village of Lansing, No. 95

Civ. 6064, 1997 WL 176576, at *5 n. 13 (N.D. Ill. April 4, 1997) ("<u>Younger</u> abstention typically arises where a party has an action filed against him in state court to enforce an ordinance or statute, and he commences suit in federal court challenging the legislation's constitutionality.") (collecting cases).

The Third and Seventh Circuits are not alone in adhering to this legal application.  <u>See, e.g.</u>, <u>Devlin v. Kalm</u>, 594 F.3d 893, 895 (6th Cir. 2010); <u>Dukes v. Maryland</u>, No. 11 Civ. 876, 2011 WL 4500885, at *4 (D. Md. Sept. 27, 2011) ("The Fourth Circuit has twice reiterated that the distinction between remedial and coercive administrative proceedings is relevant to determining whether abstention is appropriate."); <u>Moore v. Medows</u>, No. 07 Civ. 631, 2007 WL 1876017, at *5–6  (N.D. Ga. June 28, 2007) (finding <u>Younger</u> abstention unwarranted where the plaintiff initiated a remedial challenge to a state administrative order reducing skilled nursing care hours covered by Medicaid).  Most recently, the Tenth Circuit fully explored the remedial/coercive distinction and developed a structured approach for lower courts to incorporate the distinction into the traditional three-part <u>Younger</u> inquiry.  <u>See generally Brown ex rel. Brown v. Day</u>, 555 F.3d 882 (10th Cir. 2009).  Also, the First and Ninth Circuits expressly require a state-initiated action to show the existence of a coercive proceeding.  <u>See Guillemard-Ginorio v. Contreras-Gomez</u>, 585 F.3d 508, 522 (1st Cir. 2009); <u>San Jose Silicon Valley Chamber of Commerce Political Action Comm. v. City of San Jose</u>, 546 F.3d 1087, 1092 (9th Cir. 2008).

The Second Circuit has not expressly ruled on this issue, but any inferences drawn from its opinions appear to indicate that the distinction is one that is valid.  <u>Compare Bethpage Lutheran Serv., Inc. v. Weicker</u>, 965 F.2d 1239 n.2 (2d Cir. 1992) ("Moreover, under <u>Younger</u> . . . and its progeny, abstention is appropriate to avoid federal court interference with pending state

"coercive" proceedings.") with Univ. Club v. City of N.Y., 842 F.2d 37, 42 (2d Cir. 1988) ("Union League contends that because the commission's proceedings are civil rather than criminal, they are 'remedial' rather than 'coercive'.  This argument has no merit . . . We have little difficulty concluding that the commission proceedings here are coercive in nature; indeed, that is precisely what Union League is concerned about.").  Moreover, at least one district court in this Circuit has explicitly embraced it.  See, e.g., OMYA, Inc. v. Vermont, 80 F. Supp. 2d 211, 215 (D. Vt. 2000).  In OMYA, the District Court of Vermont highlighted that "the Younger line of cases uniformly involves state actions brought by the state against the federal plaintiff."  Id. at 215.  The OMYA court went on to note that a "notably different procedural posture" presented itself in that case:

> Here, OMYA has brought suit in state court challenging the legality of the permit restrictions placed on it by the Environmental Board. Defendants have admitted that there is no pending threat of prosecution or enforcement in this case.  The Younger line of cases is solely concerned with preventing Defendants in state court from circumventing state prosecution or enforcement by way of federal judicial intervention.

Id. at 216.  Thus, the Court "declined to extend Younger to cases that involve proceedings in state court which were initiated by the federal Plaintiff."  Id.  But see Libert Mut. Ins. Co. v. Hurlbut, No. 08 Civ. 7192, 2009 WL 604430, at *4 (S.D.N.Y. March 9, 2009) ("In addition, the fact that the proceedings are between private parties does not preclude abstention, as the state has an interest here that goes beyond its interest as adjudicator of wholly private disputes.") (internal quotation and citation omitted).

Certainly, this distinction is one that has been criticized.  See Turner, supra ("Whether a proceeding is remedial or coercive should not be an all or-nothing, either-or question but rather one of degree relevant for measuring the state's interest. . . . Proceedings necessary for the

vindication of important state policies encompass remedial proceedings in which the state

defends its policies against allegations of wrongdoing"); Taylor G. Selim, Note, Remedial and

Coercive Administrative Proceedings Under Younger: The Tenth Circuit's Test in Brown v.

Day, 2010 BYU L. Rev. 267 (2010).  In addition, the fact that not every Circuit is in line with

this thinking is an important consideration.  Compare Alleghany Corp. v. Haase, 896 F.2d 1046,

1053 (7th Cir. 1990) (finding the distinction matters in a decision to hear the federal suit), and

Gordon v. E. Goshen Twp., 592 F. Supp. 2d 828, 842 (E.D. Pa. 2009) (declining to apply

Younger abstention on the ground that plaintiffs' state case was a remedial action in a case

involving residents seeking an injunction to stop an ordinance from allowing deer hunting with a

bow in township) with Alleghany Corp. v. McCartney, 896 F.2d 1138, 1145 (8th Cir. 1990)

(finding distinction does not matter in decision to abstain).

      Nonetheless, whether looking at the initiating party or the underlying nature and

substance of the proceedings, the state court action here is clearly remedial.  See Brown v. Day,

555 F.3d 882, 896 (10 Cir. 2009) (Tymokovich, J., dissenting) ("By making the distinction turn

on the underlying nature and substance of the administrative proceedings, we can ensure

Younger abstention applies only to proceedings—like criminal prosecutions—of paramount

importance to the state.").  The Court finds that this is not the type of parallel state court

proceeding for which a federal court must abstain under Younger.  See Devlin, 594 F.3d at 895

("Accordingly, Younger does not prevent the federal court from ruling on Devlin's claims in the

present suit because Devlin is the plaintiff in both the federal and state proceedings, and Devlin

does not seek to enjoin the state proceedings or otherwise use the federal court to shield him

from state enforcement efforts.").  "The jurisdictional sword that sustains federal rights should

not be swiftly sheathed simply because a concurrent parallel attack has been mounted in the state

courts." <u>United Fence & Guard Rail Corp. v. Cuomo</u>, 878 F.2d 588, 595 (2d Cir. 1989).

In sum, because the state court action initiated by the Jaronczyk Plaintiffs is remedial, the Court finds that <u>Younger</u> abstention is not applicable to the instant case.

## D. **Supplemental Jurisdiction**

In the alternative, the Defendants contend that the Court should decline to exercise supplemental jurisdiction over the state law claims that are asserted in both this case and the case before the Nassau County Supreme Court.  Federal courts are, of course, courts of limited jurisdiction.  Pursuant to 28 U.S.C. § 1367(c), which codified the earlier doctrine of pendent jurisdiction:

> The district courts may decline to exercise supplemental jurisdiction over a claim . . . if—
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Here, the Court finds that both (1) and (4) are applicable, so that the Court declines to exercise supplemental jurisdiction over the state law claims.

When the "state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts".  <u>Seabrook v. Jacobson</u>, 153 F.3d 70, 72 (2d Cir. 1998); <u>see</u> <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").  Regardless of whether

31

a particular set of plaintiffs have instituted a state court action, the Court finds significant reasons

to avoid making a determination as to novel and complex state law questions concerning the

New York State Constitution, the Municipal Home Rule Law, the Public Officers Law, the Open

Meetings Law, and the General Construction Law.  Putting aside the clear constitutional

question, what remains is a dispute as to the proper application of various nuanced New York

statues.  See Brooklyn Heights Ass'n v. Nat'l Park Service, 818 F. Supp. 2d 564, 572 (E.D.N.Y.

2011); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) ("[T]he state law claims

should be dismissed so that state courts can, if so called upon, decide for themselves whatever

questions of state law this case may present.").

      The particular state law claims asserted in this consolidated case turn on whether LL 315-

12 is inconsistent with the Taylor Law, as well as whether its enactment violated the state Open

Meetings Law, General Construction Law, and Nassau County Charter.  The Court finds that

these claims raise novel and complex questions of state law that are better left for the state court

system to resolve, and thus declines to exercise supplemental jurisdiction.  See Seabrook v.

Jacobson, 153 F.3d 70, 71 (2d Cir. 1998) ("In consideration of all the factors outlined below,

[including] that the remaining state law claim turned on a novel and complex issue involving the

interpretation of state statutes concerning the administration of state government and the

balancing of important state policies, we conclude that the District Court should have dismissed,

rather than retained supplemental jurisdiction over the state law claim."); Garcia ex. Rel Marin v.

Clovis Unified Sch. Dist., 627 F. Supp. 2d 1187, 1209 (E.D. Cal. 2009) ("The Ninth Circuit has

found it proper to decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(1) in

situations where the scope of a state legislative enactment is unknown . . . or when the

application of a state statute is a question of first impression." (citing Lovell by & Through

32

Lovell v. Poway Unifed Sch. Dist., 90 F.3d 367, 374 (9th Cir. 1996) and Arpin v. Santa Clara

Valley Transp. Agency, 261 F.3d 912, 927 (9th Cir. 2001)).  Baines v. Masiello, 288 F. Supp. 2d

376, 396 (W.D.N.Y. 2003) (declining to exercise supplemental jurisdiction under (c)(3), but

noting that "considerations of judicial economy, convenience, fairness to the litigants, and

comity owed to the state courts favor having the remaining factual and legal issues as to whether

the City's enactment of Local Laws Nos. 8 and 13 comply with the relevant state and municipal

laws determined in the state forum."); Noble v. White, 996 F.2d 797, 800 (5th Cir. 1993) ("In

light of the discretion afforded to district courts in making § 1367(c)(3) determinations, and the

well established policy considerations militating against federal court involvement in state

election disputes arising under state law, we hold that the district court did not abuse its

discretion in remanding the state law claim to state court.").

   "Additionally and finally, the existence of the parallel, ongoing state court proceeding

also provides a compelling reason for declining supplemental jurisdiction under 28 U.S.C. §

1367(c)(4)."  Id. (citing Kleiman v. O'Neill, No. 03 Civ. 3829, 2008 WL 5582453, at *3

(E.D.N.Y. Dec. 30, 2008) ("The existence of a parallel proceeding addressing the same

allegations may give rise to an exceptional circumstance supporting the Court's refusal to

exercise supplemental jurisdiction under subsection (c)(4)."); Baines, 288 F. Supp. 2d at 396

(declining to exercise supplemental jurisdiction in part because "all of the state law claims set

forth in the Second Amended Complaint have been raised in a parallel action currently pending

in New York State Supreme Court"); Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1998 WL

122714, at *1–2 (S.D.N.Y. Mar. 19, 1998)).  As set forth above, the Jaronczyk Plaintiffs are

currently pursue their state law claims in the New York State Supreme Court.  Allowing the

same claims to proceed in parallel state and federal actions may "frustrate judicial economy."

SST Global Tech., LLC v. Chapman, 270 F. Supp. 2d 444, 459 (S.D.N.Y. 2003) (citing Hays

County Guardian v. Supple, 969 F.2d 111, 125 (5th Cir. 1992)).

Therefore, the Court declines to exercise jurisdiction over the Plaintiffs' state law causes

of action.  See, e.g., Am. Exp. Travel Related Servs., Inc. v. Kentucky, 597 F. Supp. 2d 717, 721

(E.D. Ky. 2009) ("In the present case, the requirements for the Younger abstention doctrine have

been met as to the Plaintiff's state claim . . .  alleging violation of §§ 42 and 56 of the Kentucky

Constitution.  This issue is being addressed by the Franklin Circuit Court. . . .Therefore, the

Court will not interfere with the state court's determination of these state law issues.") aff'd, 641

F.3d 685 (6th Cir. 2011).  Accordingly, the Court will only address the single federal claim on

this motion for a preliminary injunction.

### E.  Legal Standard for a Preliminary Injunction

"In order to justify a preliminary injunction, a movant must demonstrate (1) irreparable

harm absent injunctive relief; and (2) 'either a likelihood of success on the merits, or a serious

question going to the merits to make them a fair ground for trial, with a balance of hardships

tipping decidedly in the plaintiff's favor.'"  Metro. Taxicab Bd. of Trade v. City of New York,

615 F.3d 152, 156 (2d Cir. 2010) (quoting Almontaser v. N.Y. Dep't of Educ., 519 F.3d 505, 508

(2d. Cir. 2008)).  Generally, the purpose of a preliminary injunction is to preserve the status of

the parties until a determination on the merits of the plaintiffs' claims can be made.  Univ. of

Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981).

However, "[w]hen, as here, the moving party seeks a preliminary injunction that will affect

government action taken in the public interest pursuant to a statutory or regulatory scheme, the

injunction should be granted only if the moving party meets the more rigorous likelihood-of-

success standard." Metro. Taxicab, 615 F.3d at 156 (quoting Cnty. of Nassau v. Leavitt, 524

F.3d 408, 414 (2d Cir. 2008)); Lynch v. City of New York, 589 F.3d 94, 98 (2d Cir. 2009).

## F.  **Irreparable Harm**

The concept of irreparable harm has been described "as certain and imminent harm for

which a monetary award does not adequately compensate." Wisdom Import Sales Co. v. Labatt

Brewing Co., 339 F.3d 101, 113–14 (2d Cir. 2003).  It is essential for the Plaintiffs to meet this

burden in order to obtain the preliminary injunctive relief they seek.  See Reuters Ltd. v. United

Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) ("[A] showing of probable irreparable harm is

the single most important prerequisite for the issuance of a preliminary injunction.").

First, as a general matter, there is a presumption of irreparable harm when there is an

alleged deprivation of constitutional rights.  See, e.g., Elrod v. Burns, 427 U.S. 347, 373, 96 S.

Ct. 2673, 49 L. Ed. 2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury.") (citing New York Times Co. v.

United States, 403 U.S. 713, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971)); Statharos v. New York

City Taxi and Limousine Comm'n, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege

deprivation of a constitutional right, no separate showing of irreparable harm is necessary.")

(citing Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996)); Mitchell v. Cuomo, 748

F.2d 804, 806 (2d Cir. 1984) ( "When an alleged deprivation of a constitutional right is involved,

most courts hold that no further showing of irreparable injury is necessary.") (citing 11 C.

Wright & A. Miller, Federal Practice and Procedure, § 2948, at 440 (1973)); see also Jolly v.

Coughlin, 76 F.3d 469,482 (2d Cir. 1996) ("The district court . . . properly relied on the

presumption of irreparable injury that flows from a violation of constitutional rights.").  This

notion is not just limited to violations of free speech or due process, but may include violations

of the Contract Clause as well, as alleged here.  See Univ. of Hawaii Prof. Assembly v. Cayetano, 16 F. Supp. 2d 1242 (D. Hawaii 1998), aff'd, 183 F.3d 1096 (9th Cir. 1999).

While the assertion of a constitutional injury is insufficient to automatically trigger a finding of irreparable harm, KM Enterprises, Inc. v. McDonald, No. 11 Civ. 5098, 2012 WL 540955, at *3 (E.D.N.Y. Feb. 16, 2012) (Spatt, J.), where, as here, the constitutional deprivation is convincingly shown and that violation carries noncompensable damages, a finding of irreparable harm is warranted.  Donohue v. Paterson, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010).  Of course, the Court cannot determine whether the constitutional deprivation is convincingly shown without assessing the likelihood of success on the merits.  Turley v. Giuliani, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000) ("Because the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.") (citation omitted).  However, in light of the Court's finding below that the Plaintiffs have successfully met their burden in establishing a likelihood of success on the merits of their constitutional claim, the imminent harm prong of the analysis is satisfied.

The Defendants emphasize that the mere assertion of a constitutional injury is insufficient as a matter of law to grant injunctive relief.  In particular, the Defendants maintain that "[s]ince Local Law 315 has not been implemented [through the issuance of executive orders], Plaintiffs cannot assert a constitutional injury at this time and this Court cannot issue a preliminary injunction."  The Defendants are correct in that the harm cannot be purely theoretical.  See Ivy Mar Co. v. C.R. Seasons Ltd., 907 F. Supp. 547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); Hancock v. Essential Resources, Inc., 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief

36

cannot rest on mere hypotheticals.").  Nevertheless, this case is unlike those in which the possibility of harm is only a remote possibility.

This is so because even prior to the issuance of any executive orders that would implement this law, the constitutional injury has likely occurred.  As will be further explored below in the context of the likelihood of success on the merits analysis, the creation of authority in the County Executive to unilaterally and limitlessly "modify any County contracts" in contravention of any currently existing CBAs is likely a constitutional injury in and of itself. Thus, it is not the specific actions that the County Executive has the ability to do under the Local Law, such as freezing wages, that are the most troubling.  Rather, it is the power to do any number of these things, or for that matter, modify *any* aspect of a county employment contract unilaterally and limitlessly, that is the crux of the dilemma.  It is the power to strike entire provisions of a carefully negotiated CBA at will that is the irreparable harm.  That constitutional injury, based purely on the language of the law, has certainly been established here.  See Smith v. City of Enid By and Through Enid City Com'n, 149 F.3d 1151, 1154 (10th Cir. 1998) ("Mr. Smith has brought an impairment of contract claim, the very essence of which is a substantial impairment of plaintiff's contractual relationship with the state by a change in law. . . Thus, the constitutional injury occurred when the 1990 amendment became law, not when the consequence of that constitutional injury—here, Mr. Smith's termination by the City and System—manifested itself.").  As the Plaintiffs have expressed, "it is ludicrous to argue that a party must wait until a contract is breached before it can seek legal protection if the impairment is unconstitutional." (Donohue Reply, at 2.)

The possibility of enforcement in the present case is analogous to cases in the criminal context, where a criminal statute is passed but has yet to be enforced.  In those instances, a party

is not required to first "expose himself to liability before bringing suit to challenge the basis for the threat." MedImmune v. Genentech, Inc., 549 U.S. 118, 129, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007).  Thus, although criminal in nature, the case of New York State Bar Ass'n v. Reno is instructive.  In that case, the New York State Bar Association ("NYSBA"), sought to enjoin the Attorney General of the United States from enforcing section 4734 of the Balanced Budget Act of 1997, which would criminalize an attorney's conduct in counseling or assisting an individual to dispose of certain assets to qualify for Medicaid.  With regard to irreparable harm, the Attorney General stated that the Department of Justice would not enforce this provision, and thus NYSBA members would face no threat of criminal sanction.  Here, the Defendants maintain that there is no irreparable harm unless they choose to enforce this provision through an executive order.  However, as in Reno, the "Defendant[s'] argument . . . misses the point."  Id. at 714. While analyzing the issue from the intertwined aspect of ripeness, the Reno court found that "Governmental infringement of the First Amendment does not exist merely in the *imposition* of criminal sanctions".  Id.  Rather, the First Amendment is implicated whenever free speech is either threatened or impaired.  By extension here, the Contract Clause is implicated whenever the *passage* of a law impairs the ability to negotiate and enter into contracts.

In sum, the court reiterates that the imminent harm inquiry merges with the likelihood of success analysis.  The mere passage of this law renders the CBAs essentially meaningless and makes the contracts less binding, or not binding at all, on the County.  The likelihood of success on this constitutional deprivation is so great that irreparable harm is inevitably shown.  Thus, the Court need not assess whether the implementation of certain executive orders which would result in economic loss constitute irreparable harm.

In any event, even if the Court were to find that the assertion of a constitutional violation alone is insufficient to constitute irreparable harm, there is certainly more at stake here.  There is an intangible harm that goes well beyond the potential economic loss—i.e., wage freezes, furloughs—that stems from the constitutional injury.  The County Executive's power that is derived from LL 315-12 to limitlessly impair contractual rights results in a monumental shift between the employer and the employee, as well between the bargaining units and their members.  Before an executive order has even been issued, harm to the Plaintiffs has likely occurred in that the unions have arguably been rendered futile and ineffective solely by the law's passage.  As one set of Plaintiffs articulates, "Plaintiff unions are injured in that they are practically stripped of the ability to protect their membership at the bargaining table."  (Carver Mem. at 7.)

Bargaining units such as the CSEA can no longer represent their members in any meaningful way, now that any negotiated provision they have endeavored to secure in the past can instantly be reduced to a nullity.  If the Plaintiffs' past bargaining efforts have what is only provisional status until the County Executive decides, at its whim, to negate whole portions of the CBAs, this can undoubtedly impair the entire purpose behind the unions' existence and hence erode the relationship between the unions and their members.  See Lineback v. Irving Ready-Mix, Inc., 653 F.3d 566, 570 (7th Cir. 2011) ("Finding the employer's practices to be 'enormously destructive' to the union's organizational efforts, [there was] no trouble concluding that the union had established irreparable harm.  This conclusion was clearly correct.  We have previously found circumstances such as these—a decline in the union's membership, loss of employee benefits, and *ongoing erosion of the employer-union relationship*—to be sufficient to establish irreparable harm.") (emphasis added); see also Frankl v. HTH Corp., 825 F. Supp. 2d

1010, 1046 (D. Hawaii 2011) ("an unremedied refusal to bargain with a union, standing alone, is

to discredit the organization in the eyes of the employees, to drive them to a second choice, or to

persuade them to abandon collective bargaining altogether." (internal quotation and citation

omitted));  McLeod v. Gen. Electric Co., 366 F.2d at 850 ("the district court has the power to

order immediate bargaining to prevent irreparable harm to the union's position in the plant, to the

adjudicatory machinery of the NLRB, and to the policy in favor of the free selection of collective

bargaining representatives.").

      Moreover, the Plaintiffs' existence is at stake if, in the future, any further negotiations

with the County on behalf of their members would be a façade because the County Executive

would be able to subsequently modify any of its terms.  See Alday v. Raytheon Co., No. 06 Civ.

32, 2006 WL 2294819, at *7 (D. Ariz. July 27, 2006) ("The Court finds that CBAs negotiated by

unions and employers establish the contractual relationship between union members and

employers.  Unilateral changes to CBAs by the employer, union, or employees are invalid as

contract modifications because of lack of mutuality. . . . Employers cannot unilaterally reserve

the right to change the terms of a CBA and then adopt terms that conflict with rights granted

under a CBA."); Cf. Wisconsin Educ. Ass'n Council v. Walker, 824 F. Supp. 2d 856, 864 (W.D.

Wis. 2012) ("under Act 10, unions representing 'general employees' are no longer permitted to

bargain collectively over a broad array of topics related to wages, hours, and conditions of

employment.  Instead, collective bargaining is limited to 'only total base wages and excludes any

other compensation, which includes, but is not limited to, overtime, premium pay, merit pay,

performance pay, supplemental compensation, pay schedules, and automatic pay progressions.'"

(citing 2011 Wis. Act 10 §§ 210, 245, 262, 314)).  As articulated by one set of Plaintiffs here,

"[i]f a public employer can gain through legislation what it gave up during good faith

negotiations, that employer's arguments and the negotiations that bore [that] agreement become meaningless."  (Jaronczyk Reply at 5.)

Finally, it is worth highlighting the practical harm that results from the passage of LL 315-12, even if an executive order is never issued.  To the extent that the Plaintiffs' characterizations of the realities surrounding the passage of LL 315-12 are legitimate, this law arguably places a knife to the throat of the unions to coerce them into making certain concessions, under the threat of the County Executive taking more egregious actions pursuant to LL 315-12.  This severely disrupts any balance at the bargaining table that should exist between the County government and its employees.  (See Jaronzyck Reply at 4–5 ("nothing . . . requires the unions and the civil servants and law enforcement officers represented by them to exist with a guillotine hovering over their heads.").)  This impairment to the bargaining relationship is an irreparable harm that cannot be ignored.

Although a finding of irreparable harm need not rely on this ground, it is also possible that actions that could conceivably be taken under this law may provide support for a finding of irreparable harm as well.  The procedural mechanism set up in LL 315-12—that the Executive must issue an executive order to actually implement its provisions—should not necessarily shield the government in an absolute fashion.  See Idaho Bldg. and Const. Trades Council, AFL-CIO v. Wasden, 834 F. Supp. 2d 1091, 1101 (D. Idaho 2011) ("Therefore, as Plaintiffs posit, 'the Attorney General's 'nuanced' enforcement approach would do nothing to shield the plaintiffs from [the Fairness in Contracting Act's] unlawful effects.'").  According to the CSEA, this procedure, as well as the ten day waiting period the Defendants suggest before any executive order is acted upon, is a "semantics game" and is "merely a dilatory tactic."  (CSEA Reply at 3.)

41

Thus, beyond the clear instances of imminent harm already established, if the Court were to also consider the possibilities of imminent harm that would result should the County Executive act on any of these provisions, the existence of imminent harm would be substantially solidified.  The possibility of significant economic losses, in addition to the constitutional interference explored above, strengths the Plaintiffs' arguments that it will be irreparably harmed.

Take for example the provision in LL 315-12 that allows the County Executive to "relieve from duty any . . . employees represented by a collective bargaining unit for one day per week."  (LL 315-12 §2 (A)(1).)  Certainly, loss of employment does not, as a general matter, constitute irreparable injury.  See Sampson v. Murray, 415 U.S. 61, 90–91, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974); Int'l Bh'd of Teamsters v. Pan Am., 607 F. Supp. 609, 613–14 (E.D.N.Y. 1985) (stating the "clear" law in this Circuit that "lost wages do not constitute irreparable harm where the financial injury falls on an easily ascertainable group of employees capable of ultimately being redressed").  However, as in the case of Donohue v. Paterson, 715 F. Supp. 2d 306, 315 (N.D.N.Y. 2010), "[m]ost obviously, unlike in [the Supreme Court case of] Sampson [v. Murray], the challenged action does not involve an individual probationary employee's discharge, but rather the massive furloughing and wage freeze of tens of thousands of workers." The temporary loss of pay that would result if the Local Law were implemented to furlough employees for one day per week would amount to twenty percent of the individuals' incomes. This is a substantial amount and "even a temporary loss of pay can have far reaching and dire consequences." Id. at 316 ("Plaintiffs have met their burden of showing that the permanent 20% loss in salary and wages that the furlough plan effects constitutes irreparable harm and that irreparable harm flows from Defendants' failure to pay the contracted-for increases in salaries

and wages").  As stated by the Second Circuit in 1991 in discussing the non-compensable

damages that could result to employees due to a lag policy:

> Many have undoubtedly committed themselves to personal long-term obligations such as mortgages, credit cards, car payments, and the like—obligations which might go unpaid in the months that the lag payroll has its immediate impact.  Cf. Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 342 n.9, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969) ("'For a poor man . . . to lose part of his salary often means his family will go without the essentials.'") (quoting statement of Congressman Gonzales, 114 Cong. Rec. 1833).

Assoc. of Surrogates and Supreme Court Reporters v. State of New York, 940 F.2d 766, 772 (2d

Cir. 1991).

　　As another example of irreparable harm that may ensue if Mangano were to issue an

executive order under LL 315-12, he would have the power to "reduce or eliminate employer

contribution to employee benefits".  (LL 315-12 §2 (A)(5).)  As a consequence of this action, not

only would county employees' health benefits and the like be affected, but the employees'

families may also suffer.  See Comm'ns. Workers of Am., Dist. One, AFL-CIO v. NYNEX

Corp., 898 F.2d 887, 891 (2d Cir. 1990) ("In this circuit, the threat of termination of medical

benefits to striking workers has been held to constitute irreparable harm."); Whelan v. Colgan,

602 F.2d 1060, 1062 (2d Cir. 1979) ("the threatened termination of benefits such as medical

coverage for workers and their families obviously raised the spectre of irreparable injury.").

　　While LL 315-12 does not necessarily eliminate the benefits directly, but rather only

eliminates the County's contribution to those benefits, this would not alter the analysis.  By

eliminating the portion of the County's contribution, this would likely result in the employees

having to make significantly higher payments to continue their coverage.  See Cooper v. TWA

Airlines, LLC, 274 F. Supp. 2d 231, 240 (E.D.N.Y. 2003) (noting that as a result of furloughing,

the plaintiffs would "have the right, pursuant to the provisions of the Consolidated Omnibus

Budget Reconciliation Act ("COBRA") 29 U.S.C. § 1161, et seq., to continue group rate

coverage under the health benefit plan for an additional seventeen months.  The cost to continue

coverage, however, is significantly more expensive than the contributions they were required to

make as employees.").

Again, the Court reiterates that it does not rely on the specific actions Mangano may

pursue under LL 315-12 as the basis its finding of irreparable harm.  See Jones v. Niagara

Frontier Transp. Auth., 524 F. Supp. 233, 239 (W.D.N.Y. 1981) ("Although the threatened harm

need not be absolutely certain to occur, it must be more than merely remote and speculative.").

Nevertheless, these potential impairments are important to address, especially to provide context

for why the list of threatened actions contained in LL 315-12 results in the harm of a

metaphorical guillotine hanging over the unions' heads.

As a final matter in connection with the irreparable harm inquiry, the Defendants assert

that even if this Court finds that LL 315-12 poses an imminent threat of irreparable harm, the

Defendants will stipulate to an order from the Court directing that no executive order issued

pursuant to the law will go into effect until ten days after it is issued.  Thus, the Defendants

maintain that this would provide the Plaintiffs with ample time to seek judicial relief if they

believe an executive order contains unlawful contractual impairments, thereby eviscerating any

inference of irreparable harm.

However, as with the requirement of an executive order explored above, this procedural

structure does not lessen the irreparable harm that is occurring with the law's threatening

existence.  Imminent harm has been established—it is not necessary for the County Executive to

actually issue an executive order to establish a violation of the Contract Clause.

**G.  Likelihood of Success**

Now that there has been a finding of irreparable harm, the Court moves onto the next prong of the analysis: whether there is a likelihood of success on the merits.  The Court will only assess whether the Plaintiffs have a likelihood of success on their Section 1983 claim for violations of the Contracts Clause of the Constitution.  To the extent that any of the Plaintiffs brought additional federal causes of action in their individual complaints, they have not briefed these claims and thus they will not be considered.

In order to state a valid claim under 42 U.S.C. § 1983, a plaintiff must show that the conduct in question deprived him of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and that the acts were attributable at least in part to a person acting under color of state law.  42 U.S.C. § 1983; Washington v. Cnty. of Rockland, 373 F.3d 310, 315 (2d Cir. 2004).  It is well-settled that Section 1983 itself "creates no substantive rights" but rather "provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 2432, 85 L. Ed. 791 (1985)).

The Contract Clause of the United States Constitution, Article I, section 10, cl. 1 provides that "no State shall . . . pass any . . . Law impairing the Obligation of Contracts . . ."  While on its face this prohibition appears to be unqualified, "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula."  Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428, 54 S. Ct. 231, 236, 78 L. Ed. 413 (1934); see also W.B. Worthen Co. v. Thomas, 292 U.S. 426, 433, 54 S. Ct. 816, 78 L. Ed. 1344 (1934) ("[L]iteralism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection.").

The Supreme Court has articulated the test for violations of this Clause as requiring that "an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 25, 97 S. Ct. 1505, 1519 (1977).  More recently, the Second Circuit described the relevant inquiry under the Contract Clause as follows:

> To determine if a law trenches impermissibly on contract rights, we pose three questions to be answered in succession: (1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary.

Buffalo Teachers Fed. V. Tobe, 464 F.3d 362, 368 (2d Cir. 2006) (citing Energy Reserves Group, 459 U.S. at 411–13, 103 S. Ct. 697; Sanitation & Recycling Indus., 107 F.3d at 993.)

### 1.  Substantial impairment

The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Energy Reserves Group, Inc. v. Kansas Power and Light, 459 U.S. 400, 406, 411, 103 S. Ct. 697, 701–02, 704, 74 L. Ed. 2d 569 (1983) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244, 98 S. Ct. 2716, 2722, 57 L. Ed. 2d 727 (1978)).  This Circuit has stated that "the primary consideration in determining whether the impairment is substantial is the extent to which reasonable expectations under the contract have been disrupted." Sanitation and Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 993 (2d Cir. 1997) (citing Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411–13, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983)); see also Buffalo Teachers, 464 F.3d at 368 ("To assess whether an impairment is substantial, we look at the extent to which reasonable expectations under the contract have been disrupted.") (internal citation omitted).

46

There is no doubt that LL 315-12 operates as a substantial, if not a total impairment, of the relevant contractual relationships.  This law falls squarely within the language espoused by the Supreme Court for the reasoning underlying this constitutional mandate in the first instance:

> The occasion and general purpose of the contract clause are summed up in the terse statement of Chief Justice Marshall in Ogden v. Saunders, 12 Wheat. 213, 354, 355, 6 L. Ed. 606:  'The power of changing the relative situation of debtor and creditor, of interfering with contracts, a power which comes home to every man, touches the interest of all, and controls the conduct of every individual in those things which he supposes to be proper for his own exclusive management, had been used to such an excess by the state legislatures, as to break in upon the ordinary intercourse of society, and destroy all confidence between man and man.  This mischief had become so great, so alarming, as not only to impair commercial intercourse, and threaten the existence of credit, but to sap the morals of the people, and destroy the sanctity of private faith.  To guard against the continuance of the evil, was an object of deep interest with all the truly wise, as well as the virtuous, of this great community, and was one of the important benefits expected from a reform of the government.'

Blaisdell, 290 U.S. at 427–28, 54 S. Ct. at 236.

With reasonable certainty, LL 315-12 operates as a substantial impairment of the contractual relationships at issue, even prior to the issuance of any executive orders.  The catch-all provision of LL 315-12 is the antithesis of minimal. A law that provides only one side of the bargaining table with the power to modify any term of a contract after it has been negotiated and executed is perhaps the epitome of a substantial impairment to a contractual relationship.  See Baltimore Teachers Union, Am. Federation of Teachers Local 340, 6 F.3d 1012, 1016 (4th Cir. 1993) ("Given the value ascribed to contracts in our society, and the Constitution's explicit proscription on the state's impairment of contracts, we would not hold, absent the clearest evidence, that the City intended to confer upon the Board of Estimates even the power unilaterally to modify the City's contracts.").  Cf. Surrogates, 940 F.2d at 772 (finding a lag

payroll effecting a withholding ten percent of each employee's expected wages over a period of twenty weeks to be a substantial contractual impairment).

The Supreme Court has instructed Courts to approach this query by measuring the factors that reflect the "high value the Framers placed on the protection of private contracts." Spannaus, 438 U.S. at 245, 98 S. Ct. at 2723.  The existence of LL 315-12 and the resulting disruption of the balance between the bargaining units and the county employer severely threaten the entire purpose underlying the contracts they have entered into: to "enable individuals to order their personal and business affairs according to their particular needs and interests." Id.  The present case presents a factual scenario which is far from a mere "technical" impairment that does not necessarily rise to the level of a constitutional violation.  See id. ("Minimal alteration of contractual obligations may end the inquiry at its first stage."); see also United States Trust, 431 U.S. at 21, 97 S. Ct. at 1517 ("A finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question of whether that impairment is permitted under the Constitution.").

Of controlling importance in the determination of whether a law violates the contracts clause "is the foreseeability of the law when the original contract was made; for what was foreseeable then will have been taken into account in the negotiations over the terms of the contract." Chrysler Corp. v. KolossoAuto Sales, Inc., 148 F.3d 892 (7th Cir. 1998); Baltimore Teachers, 6 F.3d at 1017 ("While the Court has not refined the analysis for assessing the substantiality of an impairment, it has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place"). Thus, while "[t]otal destruction of contractual expectations is not necessary for a finding of substantial impairment", Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S.

48

400, 411, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983), that is precisely what this case entails.

Certainly, it may be reasonable for the Plaintiffs to have anticipated that the County could take

certain actions with regard to their CBAs, particularly in light of the County's economic troubles.

However, it is unlikely that when the Plaintiffs negotiated the terms of their CBAs they foresaw

a law that would permit the County Executive to modify their employment contracts at will and

with no limits, resulting in a monumental shift between the two players at the bargaining table.

Indeed, since the law essentially renders the contractual relationship between the County

Defendants and the bargaining units meaningless, it is unlikely that these contracts would have

been entered into in the first instance if this law was a possibility in the future.

The Defendants give terse treatment to this issue in its memorandum of law.  Briefly,

they argue that because LL 315-12 does not mandate that the County Executive take any action

at all—but rather merely authorizes him to issue an Executive order to potentially take one or

more of an enumerated set of actions—there is simply no record of any contractual impairment.

As with the Court's discussion in the context of imminent harm, this argument is

unavailing.  The law gives the power to the County Executive to unilaterally modify the terms of

negotiated written contractual bargaining agreements.  This far-reaching power—a power which

appears to the Court to be unprecedented—can arguably be itself a substantial impairment to a

contractual relationship.  Moreover, the language of the Constitution states that "No state shall . .

. *pass* any . . . Law impairing the Obligation of Contracts".  Thus, to argue that the passage of

law is not sufficient to constitute a possible constitutional violation would turn this language on

its head.

Therefore, the Court has no trouble finding in this case that the Plaintiffs have demonstrated a likelihood of success in showing that LL 315-12 substantially impairs the contractual relationships at issue.

### 2.  Legitimate Public Purpose

"Even big, totally unpredictable impairments of the obligation of contracts can survive challenge under the contracts clause if they are responsive to economic emergencies".  Chrysler, 148 F.3d at 896.  A legitimate public purpose is one "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests."  Sanitation & Recycling Indus., 107 F.3d at 993.  While the potential procedural defects with the laws' passage are troublesome, the Court nevertheless finds that the Nassau County Legislature had a legitimate public purpose in enacting LL 315-12.  It is undisputable that Nassau County is in the midst of a serious financial crisis, even if the characterization or the degree of the crisis is disputed.  (See generally Affidavit of Timothy Sullivan, Deputy County Executive for Finance for the County ("Sullivan Aff."), at ¶18.)  A financial crisis for the County was officially declared in NIFA Resolution 11-304 in March 2011.  At that time, NIFA declared a "control period" based upon the finding of a "likelihood and imminence of major operating funds deficient" and thus a wage freeze was instituted.  (See Sullivan Aff., Ex. B.)

For that reason, LL 315-12 surely was not passed "for the mere advantage of particular individuals," but "for the protection of a basic interest of society".  Blaisdell, 290 U.S. at 445, 54 S. Ct. 231.  Moreover, as explained by the Second Circuit in Buffalo Teachers, "courts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest."  464 F.3d at 369; See, e.g., Blaisdell, 290 U.S. at 444–48, 54 S. Ct. 231 (finding the statute that impaired mortgages to be constitutional due to depression era exigencies); In re

Subway-Surface Supervisors Ass'n v. New York City Transit Auth., 44 N.Y.2d 101, 112–14, 404 N.Y.S.2d 323, 375 N.E.2d 384 (1978) (finding the statute that froze municipal wages to be constitutional in light of fiscal emergency afflicting New York City).

Of course, the Court cannot ignore certain ill-motivations that may linger beneath the express motivations described in the legislative intent section of the law.  (See Jaronczyk Reply at 7 ("Knowing that there is already a regime in place to address this crisis, the County's purpose in adopting Local Law 315 must be for some ulterior motive.").)  The Plaintiffs have expressed their opinion that the entire purpose of the law was intended to place a chokehold on the Plaintiff unions and thereby strong arm them at the bargaining table to make further concessions to meet the County's budgetary concerns.  (See id. at 4–5 ("nothing . . . requires the unions and the civil servants and law enforcement officers represented by them to exist with a guillotine hovering over their heads.").)  At this early stage of the proceedings, the Court will not postulate as to the true intentions behind Mangano's actions, nor will it label his motivations.  However, it is certainly worthy to note that doubts as to the incentives behind the law's passage have been raised by the parties, and thus this is not like Buffalo Teachers where "there is no evidence in the record of an ill-motive of political expediency or unjustified welching."  464 F.3d at 373.  See Blaisdell, 290 U.S. at 430, 54 S. Ct. 231 ("Every case must be determined upon its own circumstances.").  As explained below, the Court is not "comfortable" with the view that LL 315-12 "is reasonable and necessary to remedy the fiscal instability of [the County of Nassau]." Buffalo, 464 F.3d at 373.  Thus, while there is a legitimate public purpose espoused by the Legislature and accepted by this Court, this conclusion is nevertheless tempered by additional considerations.

### 3.   Reasonable and Necessary

The mere existence of a financial crisis and consequently a legitimate public purpose for

the passage of LL 315-12 does not end the relevant inquiry.  Rather, "[t]hat a contract-impairing

law has a legitimate public purpose does not mean there is no Contracts Clause violation.  The

impairment must also be one where the means chosen are reasonable and necessary to meet the

stated legitimate public purpose."  Buffalo, 464 F.3d at 369 (citing Sanitation & Recycling

Indus., 107 F.3d at 993 ("A law that works substantial impairment of contractual relations must

be specifically tailored to meet the societal ill it is supposedly designed to ameliorate.")).

Notably, the standard the Court implements at this stage of the analysis is not as

deferential as when legislation impairs the obligations of *private* contracts.  Rather, when the

state's legislation is self-serving and impairs the obligations of *its own* contracts, "a more

searching analysis under the contract clause is appropriate".  Surrogates, 940 F.2d at 771;

Buffalo Teachers, 464 F.3d at 369 ("Public contracts are examined through a more discerning

lens.").  As illuminated by the Supreme Court:

> The Contract Clause is not an absolute bar to subsequent
> modification of a State's own financial obligations.  As with laws
> impairing the obligations of private contracts, an impairment may
> be constitutional if it is reasonable and necessary to serve an
> important public purpose.  In applying this standard, however,
> complete deference to a legislative assessment of reasonableness
> and necessity is not appropriate because the State's self-interest is
> at stake.  A governmental entity can always find a use for extra
> money, especially when taxes do not have to be raised.  If a State
> could reduce its financial obligations whenever it wanted to spend
> the money for what it regarded as an important public purpose, the
> Contract Clause would provide no protection at all.

United States Trust Co., 431 U.S. at 25–26, 97 S. Ct. at 1519–20 (footnotes omitted).

The relevant inquiry for the Court is to ensure that states neither "consider impairing the

obligations of [their] own contracts on a par with other policy alternatives" nor "impose a drastic

impairment when an evident and more moderate course would serve its purposes equally well," United States Trust, 431 U.S. at 30–31, 97 S. Ct. at 1522, nor act unreasonably "in light of the surrounding circumstances," id. at 31, 97 S. Ct. at 1522.  Some factors to be considered under this inquiry include: "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency."  See Energy Reserves Grp., 459 U.S. at 410 n.11, 103 S. Ct. 697 (citing Blaisdell, 290 U.S. at 444–47, 54 S. Ct. 231); see also Spannaus, 438 U.S. at 242–50, 98 S. Ct. 2716.

A lack of reasonableness or necessity is an element of a Contract Clause claim which the Plaintiffs bear the burden of establishing.  See United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 45 (1st Cir. 2011).  Here, the Court finds that the Plaintiffs have shown a likelihood of success as to this prong of the Contracts Clause analysis.

The tremendously broad powers contained in the law likely deems it *per se* unreasonable.  The catch-all provision of LL 315-12 allows the County Executive to literally modify any term of the negotiated CBAs, eviscerating the premise underlying a contractual relationship in the first instance and severely disrupting the relationship between the unions and the County, as well as between the unions and its members.  See United States Trust, 431 U.S. at 27, 97 S. Ct. at 1520 ("The extent of impairment is certainly a relevant factor in determining its reasonableness.").  As expressed by the Donahue Plaintiffs, "[t]he power to modify any existing contract cannot be salvaged; it is the broadest and most overarching language possible."  (Donahue Reply at 7.)

Consequently, the law at issue does not enact a carefully drawn measure to achieve the savings needed.  Rather, it provides expansive and seemingly limitless power to the County

Executive without any reasonable restraints other than the procedural mechanism of an executive order.  Cf. United, 633 F.3d at 47 ("Nor does the complaint aver facts demonstrating that Act No. 7 was an excessively drastic means of tackling the deficit.").  Thus, the Court cannot say that LL 315-12 is "no greater than that necessary to meet the anticipated shortfall."  Baltimore Teachers, 6 F.3d at 1020 (citing United States Trust, 431 U.S. at 29–30, 97 S. Ct. at 1521 (criticizing a "total repeal" of bond covenant when "a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations")).  A law which gives the Executive power to modify *any* term of the Plaintiffs' employment contracts likely does not constitute a reasonable and necessary measure under the Contract Clause analysis.

In addition, this is a drastic impairment where a more moderate course would serve its purposes equally well.  The Plaintiffs contend that more moderate options are available that do not interfere with the unions' contractual rights.  The Court agrees.

First, the County's most recent letter to the Court to request a stay of this action evidences that the County is currently contemplating other possible mechanisms to achieve the $40 million fund.  The plain inference from this communication is that the Defendants are utilizing LL 315-12 as a safety net to put into action only when they feel it would be appropriate. It is difficult to find that LL 315-12 is necessary if the Defendants are content to leave the law dormant while they pursue alternative options to obtain the requisite funding.  Also, the affidavit from Deputy County Executive Thomas Sullivan states that "[t]he County has and is continuing to identify significant cost saving measures to address this fiscal crisis".  (Sullivan Aff., at ¶ 18.) This clearly buttresses the Court's finding that LL 315-12 is not necessary, as other options may be available.

Second, the law itself provides for other potential avenues for the County to obtain the $40 million in savings, such as the option to "sell, lease, or otherwise dispose of any and all real and personal property owned by the County including, but not limited to, vehicles, buildings, land, computers, and heavy machinery". Certainly, the Court makes no determinations at this time as to whether certain portions of LL 315-12, on their own, could be found to be reasonable and necessary. For instance, if the County were to pass a law that only gave the County Executive the power to furlough employees, the Court does not now weigh in on the wisdom or legality of that measure. However, the menu of options laid out in LL 315-12 belies the County's contention that impairment to the Plaintiffs' contracts is a necessary solution to their fiscal problems.

Third, the Plaintiffs have produced evidence which indicates that other more reasonable and moderate options are available. Cf. Council 31 of the Am. Fed. of State, Cnty and Munic. Employees, AFL-CIO v. Quinn, 680 F.3d 875, 885 n.4 (7th Cir. 2012) (affirming dismissal of the plaintiff's contracts clause claim because it did not plausibly allege that a more moderate alternative course of action would serve the purpose of meeting the state's fiscal needs equally well). For example, on July 13, 2012, the Nassau County Comptroller George Maragos issued a year-end financial summary, in which he suggested opportunities to achieve $90 million in budgetary enhancements, "assuming that NIFA and the legislative minority will NOT be approving bonding for property tax refunds as was budgeted for 2012." (Ortiz Affirmation, Ex. C.) These listed opportunities include efforts to (1) in-source, where possible, services performed by contractors; (2) halt all non-essential general expense purchases; and (3) consider new revenue opportunities, such as naming rights and muni-meters.

Thus, even without issuing executive orders pursuant to LL 315-12, there appear to be options available to the County that are more moderate than the substantial contractual impairment now at issue. This is sufficient at the preliminary injunction stage to demonstrate a likelihood of success by the Plaintiffs that LL 315-12 is neither reasonable nor necessary. See Univ. of Hawaii Prof. Assembly v. Cayetano, 183 F.3d 1096, 1107 (9th Cir. 1999) ("As the district court stated, '[a]lthough perhaps politically more difficult, numerous other alternatives exist which would more effectively and equitably raise revenues.' Other options available to Defendants were a federal maximization project (to obtain additional reimbursements from the federal government), additional budget restrictions, the repeal of tax credits, and the raising of taxes. Defendants have not explained why it is reasonable and necessary that the brunt of Hawaii's budgetary problems be borne by its employees.").

The Defendants contend that the passage of LL 315-12 was reasonable and necessary, because they have submitted evidence to demonstrate that they have made efforts to pursue less drastic measures to address the County's fiscal crisis. (See generally NIFA Resolution 11-304, Sullivan Aff. Ex. B.) In an affidavit from Thomas Sullivan, the Deputy County Executive for Finance for the County, the Defendants claim they have undertaken and/or considered a number of measures to address the fiscal crisis including (1) eliminating over 1,000 active personnel and over 1,600 funded positions; (2) obtaining bonding for the tax certiorari liabilities; (3) pursuing New York State legislation to add red light cameras to an additional 50 intersections to raise revenue through traffic violation fines; (4) collecting reimbursement from towns and cities in Nassau County who enroll students at a community college; and (5) selling County real and personal property. (See Sullivan Aff., ¶ 21.)

However, the key language in this affidavit is that these opportunities were merely

"undertaken and/or considered."  Thus, under a plain reading of this affidavit, it is possible that

many of these alternatives were merely discussed but not extensively investigated or reasonably

pursued.  Cf. Buffalo Teachers, 464 F.3d at 371 ("We read this to mean the wage freeze must

have been a last resort measure.  Indeed the Board imposed the freeze only after other

alternatives had been considered *and tried*.") (emphasis added).  "[A] State is not completely free

to consider impairing the obligations of its own contracts on a par with other policy alternatives."

United States Trust Co., 431 U.S. at 30–31, 97 S. Ct. at 1521–22.  Certainly, in Resolution 12-

365, NIFA found that the County expended considerable effort to identify and implement

initiatives for budgetary relief, such as the replacement of the Long Island Bus contract with a

private contractor and the planned reduction in the number of police precincts.  However, even

NIFA recognized that the possibilities contained in LL 315-12 beyond a wage freeze—such as

"layoffs and unpaid furloughs" — "are a more drastic alternative for achieving labor savings

than a temporary wage freeze."  (Sullivan Aff. Ex. A, at 10.)  Thus, notwithstanding that NIFA

found certain prior efforts by the County to support the reasonableness of the relatively more

moderate option of a wage freeze, this does not necessarily mean that those same efforts support

a finding that the more drastic measures that are available to the County Executive pursuant to

the authority in LL 315-12 are also reasonable.  Moreover, this logic surely cannot be extended

to the extreme so that it is reasonable for the County Executive to modify any county contract in

any conceivable manner.

Finally, the Court recognizes that the law is a temporary measure because it is limited

only to achieving the necessary $40 million to pay the County's tax certiorari judgments.

However, despite its temporary nature, there is no express duration contained in the law.  Thus, if

the County is unable to obtain this particular amount of money, LL 315-12 could potentially remain a valid law for an undetermined and unlimited period of time.  Theoretically, the County Executive could issue executive orders implementing the measures suggested in Section 2 for years to come, as long the $40 million has not been fully acquired.  Cf. Buffalo Teachers, 464 F.3d at 371 ("Here the impairment is relatively minimal.  Under the terms of the Act, the temporary wage freeze must be revisited by the Board on an on-going basis to assure the freeze's continued necessity.").  Thus, the asserted temporary nature of the law does not render it reasonable or necessary.

In sum, the Court finds that the Plaintiffs have demonstrated a likelihood of success as to whether there is a substantial impairment to their contracts rights and that this impairment is not reasonable nor necessary, despite being enacted for a legitimate public purpose.  Therefore, along with the finding of irreparable harm detailed above, the Court grants the Plaintiffs' motion for a preliminary injunction.  In particular, the Defendants are enjoined from commencing, maintaining, or otherwise taking any action pursuant to LL 315-12 §2(A), including the issuance of an executive order invoking this Local Law, that would modify any terms of conditions of employment set forth in the relevant Collective Bargaining Agreements or other agreements between the Plaintiffs and the County.

## H.  Whether a Bond is Necessary

As a final matter, the Defendants argue that if this Court is to grant the Plaintiffs' request for a preliminary injunction, it should require the Plaintiffs to post a bond pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65(c).  Here, the Defendants ask that at a minimum, the Plaintiffs should be required to post a bond in the amount of the cost savings the County seeks to secure under Local Law 314, which is $41 million.

Under the federal rules, there is provision for the issuance of security, in the form of a bond, where a preliminary injunction of this kind is directed.  Fed. R. Civ. P. 65(c), provides:

> (c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.  The United States, its officers, and its agencies are not required to give security.

Fed. R. Civ. P. 65(c).  "Rule 65(c)'s bond requirement serves a number of functions.  It assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff."  Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 557 (2d Cir. 2011); see also Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc., 335 F.3d 235, 240 (3d Cir. 2003) ("The [injunction] bond can . . . be seen as a contract in which the court and the applicant 'agree' to the bond amount as the 'price' of a wrongful injunction." (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 805 n.9 (3d Cir. 1989) (alterations omitted))).

Despite this rule, a district court has wide discretion to dispense with the bond requirement of Fed. R. Civ. P. 65(c) "where there has been no proof of likelihood of harm".  Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotation marks omitted).  This is because a bond is only intended to afford security for damages that might be "proximately caused by the [wrongful] issuance of [an] injunction."  B.G. Soft Ltd. v. BG Soft Int'l, Inc., No. 01 Civ. 17, 2002 WL 1467744, *2 (E.D.N.Y. Apr. 29, 2002) (internal citations omitted).  Here, the County is facing approximately $40 million in tax certiorari judgments, whether or not the Court enjoins certain actions taken pursuant to LL 315-12.  Thus, given the important potential constitutional issues, the Court, in its discretion, dismisses the bond

requirement under Fed. R. Civ. P. 65 (c).  <u>See Haitain Centers Council, Inc. v. McNary</u>, 789 F.

Supp. 541, 548 (E.D.N.Y. 1992) ("Defendants demand that plaintiffs post a $10,000,000 bond as

security.  In light of the Government's failure to substantiate its demand for a $10 million bond,

the plaintiffs' indigence, and the important questions raised in this case, the court will exercise

its discretion and waive the bond."); <u>see also Kermani v. N.Y. State Bd. of Elections</u>, 487 F.

Supp. 2d 101, 115 (N.D.N.Y. 2006) ("Upon consideration of the positions of the parties, and the

fact that neither party stands to suffer any significant monetary losses from the issuance or denial

of the preliminary injunction, and *given the important constitutional and public policy issues*

*arising in this matter*, the Court finds that no security shall be required for the issuance of this

preliminary injunction.") (emphasis added).

### III. CONCLUSION

In sum, the Court is certainly aware of the reality that "many states face daunting budget

deficits that may necessitate decisive and dramatic action."  <u>United Auto., Aerospace, Agr.</u>

<u>Implement Workers of Am. Intern.</u>, 633 F.3d 37, 43 (1 Cir. 2011).  However, even dire fiscal

circumstances cannot warrant the overly broad and substantial impairment to the Plaintiffs' clear

constitutional contractual rights that likely results from LL 315-12.


For the foregoing reasons, it is hereby:

**ORDERED**, the Plaintiffs' motion for a preliminary injunction is granted, and it is

further,

**ORDERED** that pending final judgment, the Defendants are enjoined from commencing,

maintaining, or otherwise taking any action pursuant to LL 315-12 §2(A), including the issuance

of an executive order invoking this Local Law, that would modify any terms of conditions of

employment set forth in the relevant Collective Bargaining Agreements or other agreements between the Plaintiffs and the County; and it is further

      **ORDERED**, that the Court declines to exercise supplemental jurisdiction over the state law claims, and it is further

      **ORDERED**, that the Defendants' request for the Plaintiffs to post a bond under Fed. R. Civ. P. 65(c) is denied.

**SO ORDERED.**

Dated:  Central Islip, New York
        August 20, 2012

                                      _____*/s/ Arthur D. Spatt*_____
                                          ARTHUR D. SPATT
                                United States District Judge